Electronically Filed
Intermediate Court of Appeals
CAAP-14-0000358
30-APR-2015
08:15 AM

NO. CAAP-14-0000358

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee, v.
ROYCE C. GOUVEIA, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 12-1-1474)

MEMORANDUM OPINION
(By: Fujise and Ginoza, JJ.,
with Nakamura, C.J., dissenting)

The jury submitted two notes: one announced that it had reached a verdict in the manslaughter case; the other expressed concern for the jurors' safety after observing a man, on the prosecutor's side of the courtroom, "glaring and whistling at defendant[.]" Without taking or reading the verdict, the trial court questioned the jurors about the note expressing concern for their safety. The jurors all indicated in their responses that the incident itself and their discussions concerning the incident did not affect their deliberations, but the trial court found that the jurors' responses on this point were not credible. Some jurors had testified that other jurors were worried about their safety, and one juror testified that other jurors' concern for their safety appeared to have an impact on those jurors' decisions. Over the defendant's objection, the trial court granted the prosecution's motion for mistrial based on "manifest necessity." Defendant subsequently moved to dismiss the indictment on double jeopardy grounds, which the trial court denied.

The question presented in this appeal is whether there was "manifest necessity" for the trial court's declaration of a mistrial, which would permit a retrial without violating the defendant's protection against double jeopardy. We hold that the trial court did not abuse its broad discretion in determining that manifest necessity existed for a mistrial, and therefore, retrial is not barred by double jeopardy. Accordingly, we affirm the trial court's "Order Denying Motion to Dismiss for Violation of Double Jeopardy."

BACKGROUND

Plaintiff-Appellee State of Hawai‘i (State) charged Defendant-Appellant Royce C. Gouveia (Gouveia) with recklessly causing the death of Albert Meyer (Meyer), thereby committing the offense of Manslaughter, in violation of Hawaii Revised Statutes (HRS) § 707-702(1)(a) (Supp. 2014).[1] The charge stemmed from an incident in which Gouveia struck Meyer, causing Meyer to fall and hit his head on the pavement, resulting in Meyer's death. The trial was held in the Circuit Court of the First Circuit Court (Circuit Court).[2]

The following evidence was presented at trial.

I.

A.

The State called Dash Kelly (Kelly) and Kevin Espino (Espino), who were friends of Meyer and were present during the incident that led to Meyer's death. On the evening of September 27, 2012, Meyer and Espino went to visit Kelly at Kelly's home. According to Kelly, while the three men were "talking story" outside, Gouveia drove up in a car. Kelly heard Meyer tell Gouveia to pull over so that he could "talk story." Gouveia got out of his car, met Meyer in the middle of the road, and they exchanged a few words. Then Meyer "got hit." Kelly did not actually see Gouveia hit Meyer, but Kelly heard a "hit kind of sound" and saw Gouveia's arm appear to be finishing a

---

[1] HRS § 707-702(1)(a) provides in relevant part that "[a] person commits the offense of manslaughter if . . . [t]he person recklessly causes the death of another person[.]" (Formatting altered.)

[2] The Honorable Glenn J. Kim presided.

punching-type motion. Meyer fell "straight back[,]" "was out cold . . . from the top of the fall[,]" and hit his head on the pavement. Kelly acknowledged that he "didn't see any threatening behavior on the part of [Gouveia]." Kelly also acknowledged that he was "tweaking," i.e., "under the influence of ice" when he observed the incident.

Kelly testified that after Meyer hit the pavement, Gouveia looked around, picked Meyer up from the back, and pulled him to the side of the road. Kelly then called the police, because "it was obvious that [Meyer] needed help."

Espino testified to a similar version of events leading up to Meyer's death. Espino also did not witness Gouveia actually hit Meyer, but only remembered hearing a "thud" and then seeing "somebody standing over another person . . . laid out on the ground."

Meyer was taken to the hospital by ambulance and pronounced brain dead two days later. According to Dr. Masahiko Kobayashi (Dr. Kobayashi), the deputy medical examiner who performed the autopsy, Meyer's injuries were consistent with Meyer "falling down and slamming the back of his head against the pavement[.]" The "[c]ause of death was cranial cerebral injuries, and . . . the injuries to the skull and brain were due to blunt force head trauma due to a fall."

B.

Gouveia testified that Meyer was his friend and that they grew up together. However, an "incident" occurred between him and Meyer at Gouveia's father's house. According to Gouveia, Meyer offered an ice pipe to Gouveia's father and asked if he wanted to smoke. Gouveia did not appreciate this and told Meyer to leave. Meyer "seemed mad at me[,]" so Gouveia decided to stay away from him for a while.

On September 27, 2012, Gouveia was driving with two of his friends when he saw Meyer, Kelly, and Espino. Meyer told Gouveia to pull over, which Gouveia did "[t]o [t]alk story, see what's up." At first, Meyer "seemed normal," but as Meyer approached, Gouveia could tell that Meyer "was mad at me" and that he was glaring. Gouveia testified that Meyer said, "in a

3

mad tone[,]" "hey, you fucka, why you tell me for leave that time?" Gouveia thought that Meyer was referring to the incident that had occurred at Gouviea's father's house and told Meyer that it was "because you went offer my dad ice." Meyer then pushed Gouveia, which made Gouveia "mad."

Gouveia testified that Meyer looked like he was high on drugs. Gouveia had regularly seen Meyer high on ice before, and when Meyer is "high on ice" "he gets aggressive" and "talks stupid." Gouveia became concerned that Meyer was about to attack and hit Gouveia. Gouveia explained, "that's why I went slap'em" in the face. Gouveia denied punching Meyer and said he did not want to hurt Meyer. Gouveia further explained that he slapped Meyer in the face "[t]o stop him[] [f]rom hitting me[,] to "stun him" so that Meyer could "wake up and realize that this is me, this is your friend." Gouveia testified that he did not intend to hurt Meyer or cause him to fall.

Gouveia said that Meyer fell backwards and hit his head. Gouveia observed that Meyer was knocked out and was "shocked" and "panicked[,]" thinking Meyer was hurt. Gouveia then went to help Meyer by picking him up, pulling him out of the middle of the road, telling Espino to call 911, and trying to wake Meyer up by giving him water. Gouveia left the scene when he heard the sirens because he "got scared" and "wasn't thinking clearly."

II.

A.

After the jury had deliberated for less than a day, the Circuit Court reconvened and notified the parties that it had received two communications from the jury. The first communication, signed at 2:20 p.m., stated: "We reached a verdict." The second communication, signed four minutes later, stated: "Concern. This morning on prosecutor's side of crtroom [sic] there was a man, shaved head, glaring and whistling at defendant. We have concern for our safety as jurors."

The Circuit Court initially indicated that it planned to take the verdict. However, after further discussion, the Circuit Court, with the agreement of counsel for both the State and Gouveia, decided to individually question the jurors about their safety concerns and its effect on their deliberations. The Circuit Court and the parties did not know what verdict the jury had reached.

B.

The Circuit Court and counsel proceeded to individually question the jurors, with the Circuit Court making it clear that the jurors should not disclose the verdict that had been reached. The jurors who had witnessed the incident described it as follows:

--Juror 7 stated:

> I was sitting there and I looked over as everyone was sitting down getting situated, and I saw a him [sic] in the second row sitting on the edge, larger build, he had white shirt and he was just making these really angry faces, and he wouldn't move from that spot, he wanted to make sure that -- he was trying to get defendant's attention, whistling "whoo-whoo-whoo" demonstrating.

--Juror 4 noticed a man who appeared "hostile" and was "glaring" in a certain direction of the courtroom, but was not certain whether "he was glaring at the defendant or not[.]"

--Juror 6 saw a man "glaring at the defendant" and thought "he was trying to get his attention by whistling." Juror 6 thought that the man was part of the prosecutor's side.

--Juror 3 heard whistling that morning.

The jurors gave conflicting answers regarding when the incident was discussed. Most of the jurors stated that the incident was discussed before the verdict was reached, but a few stated that it was not discussed until after. The jurors who stated the incident was discussed before the verdict was reached differed on whether the incident was discussed at the beginning, middle, or end of the deliberations and on the amount of time they spent discussing the incident. The jurors indicated that some of the jurors, particularly the women, were worried about

their safety, expressed concern about possible retaliation, and "felt slightly intimidated." Each of the jurors responded that the incident and any safety concern did not affect their own decision in the case. However, one juror stated that three or four other jurors participated in a conversation about the incident or said they saw the incident; that the jurors describing the incident sounded concerned, and she believed the conversation about the incident appeared to have an impact on other jurors' decisions; and that concern for their safety impacted other jurors' decisions. The jurors generally agreed that the decision to send the communication to the Circuit Court regarding their safety concerns came after they had reached a verdict.

### III.

### A.

The questioning of the jurors took place over a two day period. After it was completed, the Circuit Court asked defense counsel whether Gouveia wanted to move for a mistrial prior to taking the verdict. Defense counsel responded that Gouveia wanted to take the verdict and did not want to move for a mistrial. The State then moved for a mistrial based on manifest necessity.

In support of the State's motion, the deputy prosecutor argued that there were three jurors who indicated that the incident raising the jurors' safety concerns came up early in the deliberations, that one juror stated the discussion lasted for about ten minutes, and that another juror believed it had an impact on other jurors' decision or deliberation process. In addition, the deputy prosecutor pointed out that,

> this [case] did have an issue of first aggressor, and, you
> know, it's unclear whether what they saw in the gallery that
> they did associate with the prosecution and the decedent
> side, whether that had any impact on them as to whether they
> thought maybe it lended [sic] more credibility to
> Mr. Gouveia's testimony as he testified, again, considering
> things that are not -- that were not presented as part of
> the evidence.

The deputy prosecutor argued that the verdict had been tainted by extraneous inappropriate circumstances and requested that the Circuit Court declare a mistrial based on manifest necessity.

In response, defense counsel argued that the jurors were instructed by the court to make a decision solely based on the evidence, that jurors are presumed to follow instructions, and that every single juror stated that the discussion of the incident had no impact on his or her decision. Defense counsel asserted there was no "manifest necessity" to justify the declaration of a mistrial.

After considering counsel's arguments, the Circuit Court orally granted the State's motion for a mistrial and explained its reasoning as follows:

> Well, it's pretty clear to the court what everybody thinks the verdict is based on your arguments and your motions and lack of such. I don't know what the verdict is. I honestly literally don't know what the verdict is. There's no way I could know. We haven't taken the verdict yet. And, anyway, I think it's immaterial. I think it's literally immaterial to this discussion, this issue in my ruling here. And it's a really, really close ruling as far as I'm concerned. I think that's probably clear from what I've -- you know, this discussion right now. I mean, really, it's difficult, very difficult, but of course nobody forced me.
>
> You know, the bottom line to me, and it's my decision, and as I say, [defense counsel], it could be proved wrong in the fullness of time, but I find it difficult, I really do, I find it difficult to really believe when I, you know, apply my reason and common sense to this that at least some of these jurors have this, what strikes me as a really serious concern for their personal safety and it came up according to, at least as I count, four or five of them, it came up, was one of the first things, one of the first things, one of the first topics of discussion when they got back in the room and started deliberating the case. Somebody brought it up and they started talking about it. It frankly beggars [sic] my reason and common sense that it would have no bearing on the deliberations in this case and therefore the verdict.
>
> I'm going to grant the State's motion for mistrial. I'm going to find there's manifest necessity for such based on what I said and all the -- and everything else that's been put on the record, including my questions to counsel.
>
> The verdict's going to be sealed for future purposes, if any, but obviously we're not going to take the verdict. I'm declaring a mistrial and I'm finding manifest necessity for that, because I don't think there's anything short of a mistrial that's going -- that can cure it. The verdict's tainted, in my view, based on my findings.
>
> And to be explicit about it, as the finder of fact, I don't find it credible that all 12 of these people despite the answer they gave me about no impact on their decision, I think at least one, and probably more than one of them, probably the three or four women according to [Juror 9], and that's neither here nor there except he brought it up, who had these serious concerns about their safety. It really beggars [sic] my reason and common sense that it could not

> have had any impact on their deliberations and decision in this case.

(Emphasis added.)

B.

On October 22, 2013, the Circuit Court filed its "Findings of Fact, Conclusions of Law and Order Granting State's Oral Motion for Mistrial Based on Manifest Necessity."

The Circuit Court made the following pertinent findings of fact (FOF):

7.  The Court questioned the jurors individually and both counsel for the State and for Defendant were given adequate opportunity to question each juror regarding Communication No.2 [(the communication expressing the jurors' safety concerns)].

8.  Four jurors witnessed an individual seated on the prosecutor's side of the courtroom whistling and/or glaring at Defendant ("incident") prior to commencing deliberation.

9.  Seven of the jurors indicated discussion of the incident occurred before the verdict, ranging from within ten minutes of commencing deliberation to the end of deliberation. At least four of these seven jurors indicated discussion of the incident occurred at the beginning of deliberations, specifically that it was one of the first topics discussed.

10. During the discussion of the incident prior to verdict, the jurors who actually observed the incident communicated to the other jurors fear for their own safety.

11. Some of the juror answers regarding Communication No.2 and the incident included the following:

    a.  Some jurors were worried about retaliation;

    b.  The unidentified male's look appeared hostile during the incident;

    c.  Some jurors were concerned;

    d.  Some jurors felt intimidated; and

    e.  The incident impacted other jurors' decisions.

12. Although all twelve jurors indicated that neither the incident itself nor the discussion regarding the incident during the deliberations affected their own decision, at least one juror indicated that the incident appeared to have impacted the deliberation process and decision.

13. The incident was not part of the evidence in the case at hand.

14. The verdict was never taken for this case. At no point during the proceedings did the Court take, read or otherwise get any indication of the jury's verdict.

15. The Court finds that the jurors' statements that the incident did not affect their decision making process and/or deliberations are not credible as evidenced by the plain language of Communication No.2 and answers of the voir dire of each individual juror.

16. The Court further finds that the concern for personal safety as expressed by the jurors had an impact on the jurors' decisions based on the totality of the circumstances present and thus its effect on the subsequent verdict was not harmless beyond a reasonable doubt.

The Circuit Court made the following pertinent conclusions of law (COL):

3. "The sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i Constitution guarantee the criminally accused a fair trial by an impartial jury. If any juror was not impartial, a new trial must be granted. However, not all juror misconduct necessarily dictates the granting of a new trial. A new trial will not be granted if it can be shown that the jury could not have been influenced by the alleged misconduct." (Emphasis added) State v. Kim, 103 Hawai'i 285, 290-91, 81 P.3d 1200, 1205-06 (2003); see State v. Gabalis, 83 Hawai'i 40, 45, 924 P.2d 534, 539 (1996).

4. "Where the trial court does determine that such alleged deprivation is of a nature which could substantially prejudice the . . . right to a fair trial, a rebuttable presumption of prejudice is raised. The trial judge is then duty bound to further investigate the totality of circumstances surrounding the alleged deprivation to determine its impact on jury impartiality. The standard to be applied in overcoming such a presumption is that the alleged deprivation must be proved harmless beyond a reasonable doubt." State v. Bailey, 126 Hawai'i 383, 400, 271 P.3d 1142, 1159 (2012); see Furutani, 76 Hawai'i at 177, 873 P.2d at 56.

5. Communication No.2 raised the concern of the Court and both counsel that the incident may have substantially prejudiced the right to a fair trial. After further investigating the totality of circumstances surrounding Communication No.2, the Court concluded at least some of the jurors were not credible, although explicitly indicated they were not lying. The Court's concern is that although all twelve jurors unanimously agreed to release Communication No. 2, no juror admitted that the incident affected their own decision making process. Furthermore, reason and common sense dictates that the incident did have an effect on the deliberations hence the impartiality of the jurors, which is not harmless beyond a reasonable doubt[.]

6. Communication No.2 and the underlying incident could not be proven harmless beyond a reasonable doubt.

7. "[T]he trial court must grant a motion for new trial if any member (or members) of the jury was not impartial; failure to do so necessarily constitutes an abuse of discretion." State v. Sugiyama, 71 Hawaiʻi 389, 391, 791 P.2d 1266, 1267 (1990).

8. Under the totality of the circumstances in light of the plain language of Communication No. 2 and the voir dire of the individual jurors, the Court finds that the jury was not impartial in their deliberation and decision-making process. Based on the foregoing, there is no other remedy short of a mistrial to cure the issue at hand as neither a continuance nor a further jury instruction would appropriately address the issue of an impartial jury and its subsequent tainted verdict.

9. "Even in the absence of a defendant's express or implied consent to a mistrial, principles of double jeopardy pose no bar to reprosecution after discharge of a jury if there was a manifest necessity for the mistrial, or the ends of public justice would otherwise be defeated. Manifest necessity is defined as a sudden and overwhelming emergency beyond [the] control of [the] court and unforeseeable[, under circumstances in which] it becomes no longer possible to conduct [the] trial or to reach a fair result based upon the evidence." State v. Quitog, 85 Hawaiʻi 128, 143, 938 P.2d 559, 574 (1997); State v. Minn, 79 Hawaiʻi 461, 903 P.2d 1282 (1995).

10. The incident underlying Communication No.2 was both beyond the court's control and unforeseeable. Accordingly, based on Communication No.2, and the totality of the circumstances, there is manifest necessity for a mistrial.

(Some bracketed material added.)

IV.

Gouveia subsequently moved for an order dismissing the indictment on double jeopardy grounds. The Circuit Court denied the motion and on December 19, 2013, issued its "Order Denying Motion to Dismiss for Violation of Double Jeopardy." This appeal followed. For purposes of the appeal, this court unsealed the verdict. The verdict was not guilty.

DISCUSSION

On appeal, Gouveia argues that (1) the Circuit Court abused its discretion in declaring a mistrial because "manifest necessity" was not present in the instant case; and (2) reprosecution is barred by double jeopardy. As explained below, we disagree.

10

I.

The Double Jeopardy clause of the Fifth Amendment protects a defendant from being tried multiple times for the same criminal offense and is applicable to the states through the Fourteenth Amendment. Benton v. Maryland, 395 U.S. 784, 794 (1969). The Hawai'i Constitution provides double jeopardy protection against multiple trials through an analogous clause. See Haw. Const. art. I, § 10. Jeopardy attaches when the jury is empaneled and sworn. State v. Moriwake, 65 Haw. 47, 51, 647 P.2d 705, 709 (1982).

When a trial is terminated over the objection of the defendant, the test for lifting the double jeopardy bar to a second trial is the "manifest necessity" standard. Arizona v. Washington, 434 U.S. 497, 504 (1978). "A mistrial is properly declared and retrial is not barred by the defendant's right against double jeopardy where the defendant consented to the mistrial or there was manifest necessity for the mistrial." State v. Wilmer, 97 Hawai'i 238, 242-43, 35 P.3d 755, 759-60 (2001) (emphasis added). As explained by the United States Supreme Court,

> [b]ecause of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, his valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury.

Washington, 434 U.S. at 505.

"Manifest necessity is defined as circumstances in which it becomes no longer possible to conduct the trial or to reach a fair result based upon the evidence." Wilmer, 97 Hawai'i at 244, 35 P.3d at 761 (citation, internal quotation marks, and ellipsis omitted). With respect to a trial court's decision regarding the existence of manifest necessity and appellate review of such decision, the Hawai'i Supreme Court has stated:

> There are especially compelling reasons for allowing a trial judge to exercise broad discretion in deciding whether or not manifest necessity exists. Thus, great deference will be given to the trial court when it finds manifest necessity. Because manifest necessity is a high standard not to be declared lightly, a trial judge should record his

11

> or her reasons for declaring a mistrial and include the
> reasons for finding manifest necessity.

State v. Quitog, 85 Hawai'i 128, 143, 938 P.2d 559, 574 (1997)
(format altered; emphasis added) (quoting State v. Lam, 75 Haw.
195, 205, 857 P.2d 585, 591 (1993)).  When examining the record
for evidence of manifest necessity, we must determine whether the
trial court sufficiently considered less severe alternatives
available, balancing the defendant's rights against the public
interest.  State v. Minn, 79 Hawai'i 461, 465, 903 P.2d 1282,
1286 (1995).

II.

In State v. Napulou, 85 Hawai'i 49, 936 P.2d 1297 (App.
1997), this court addressed a situation similar to the instant
case and articulated a procedure that the trial court should
follow in deciding whether to declare a mistrial based on
possible juror tainting by outside influences.  In Napulou, on
the second day of jury deliberations, the court received a
communication written by two of the jurors, which read as
follows:

> Some jurors have noticed members of Napulou's family
> following them downstairs and toward the car garage.  If a
> guilty verdict is given, could there be danger to some of us
> or has some arrangement been made for protection.  (More
> than one juror)

Napulou, 85 Hawai'i at 51-52, 936 P.2d at 1299-1300 (brackets
omitted).

The court then conducted a voir dire of each juror to
determine whether, among other things, "the incidents and/or the
discussion affected the ability of any juror to be fair and
impartial, and whether the jurors could consider only the
evidence and the law and deliberate fully and fairly."  Id. at
52, 936 P.2d at 1300.  All of the jurors responded that they
could continue to deliberate on the evidence fairly and
impartially, and the trial court found the jurors to be credible.
Id. at 54, 56, 936 P.2d at 1302, 1304.  Nevertheless, defense
counsel moved for a mistrial, which the trial court denied.  Id.
at 54, 936 P.2d at 1302.  The jury subsequently found Napulou
guilty of attempted second-degree murder and other offenses.  Id.
at 51, 936 P.2d at 1299.

On appeal, Napulou argued that

> because one or more jurors improperly commented or implied
> that Napulou's family members might have followed them to
> the parking area, or that Napulou's family might pose a
> danger to jurors if they found Napulou guilty, the jury was
> tainted, resulting in substantial prejudice to Napulou's
> right to a fair and impartial jury.

Id. at 55, 936 P.2d at 1303. Napulou further argued that the jurors' responses when questioned about the communication suggested that one or more jurors was lying or concealing information about matters raised in the communication, and that such jurors could be equally dishonest about remaining fair and impartial. Id.

In evaluating Napulou's claims, this court stated that when a trial court learns that the jury has been exposed to an outside influence that might jeopardize a defendant's right to a fair trial, "the initial step for the trial court to take . . . is to determine whether the nature of the [outside influence] rises to the level of being substantially prejudicial." Id. at 55, 936 P.2d at 1303 (citation omitted and block formate altered). We further stated:

> Where the trial court does determine that such influence is
> of a nature which could substantially prejudice the
> defendant's right to a fair trial, a rebuttable presumption
> of prejudice is raised. The trial judge is then duty bound
> to further investigate the totality of circumstances
> surrounding the outside influence to determine its impact on
> jury impartiality. The standard to be applied in overcoming
> such a presumption is that the outside influence on the jury
> must be proven harmless beyond a reasonable doubt. The
> trial court, in its investigation of the totality of
> circumstances, should include individual examination of
> potentially tainted jurors, outside the presence of the
> other jurors, to determine the influence, if any, of the
> extraneous matters.

Id. at 55-56, 936 P.2d at 1303-04.

We concluded that the trial court had proceeded properly when confronted with the jury's communication and that its findings were not clearly erroneous. Id. at 56, 936 P.2d at 1304. We stated that "[t]he trial judge, as the trier of fact, was empowered to assess the credibility of the jurors." Id. We further stated that the record supported the conclusion that the jurors' concerns were in the abstract rather than the specific, that the panel could serve as impartial jurors, and that the effect of any jurors' improper comments was harmless beyond a

reasonable doubt.  Id.  Accordingly, we held the trial court did not abuse its discretion in denying Napulou's motion for a mistrial.  Id.

### III.

In the instant case, both parties agree that the Circuit Court undertook the proper procedure[3] when it individually questioned each juror regarding Communication No. 2. Based on this questioning, the Circuit Court found:

9.      Seven of the jurors indicated discussion of the incident occurred before the verdict, ranging from within ten minutes of commencing deliberation to the end of deliberation.  At least four of these seven jurors indicated discussion of the incident occurred at the beginning of deliberations, specifically that it was one of the first topics discussed.

10.     During the discussion of the incident prior to verdict, the jurors who actually observed the incident communicated to the other jurors fear for their own safety.

11.     Some of the juror answers regarding Communication No. 2 and the incident included the following:

      a.      Some jurors were worried about retaliation;

      b.      The unidentified male's look appeared hostile during the incident;

      c.      Some jurors were concerned;

      d.      Some jurors felt intimidated; and

---

[3]      Although not raised by either party, we note that Hawaii Rules of Evidence (HRE) Rule 606(b) provides:

> (b)  Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify concerning the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.  Nor may the juror's affidavit or evidence of any statement by the juror indicating an effect of this kind be received.

However, even if the Circuit Court should not have permitted the jurors to be questioned, and should not have considered their testimony, about whether the incident affected their decision under HRE Rule 606(b), Gouveia did not object to this questioning or the Circuit Court's consideration of the jurors' testimony regarding whether the incident affected their decision. Indeed, in the Circuit Court and on appeal, Gouveia relies on the jurors' testimony that the incident did not affect their own decision as the basis for arguing that the Circuit Court erred in determining that there was manifest necessity for a mistrial.  We therefore conclude that Gouveia has waived any claim of error based on HRE Rule 606(b).

e.  The incident impacted other jurors' decisions.

Gouveia did not challenge these findings on appeal and they are therefore binding on this court.  See Bremer v. Weeks, 104 Hawai'i 43, 63, 85 P.3d 150, 170 (2004).  In any event, there was substantial evidence in the record to support these findings, and we conclude that they are not clearly erroneous.

The focus of Gouveia's appeal is his challenge to the Circuit Court's finding that the jurors' statements that the incident did not affect their decisionmaking process and/or their deliberations were not credible.  Gouveia contends that "[a]ll twelve jurors informed the trial court that his or her individual decision was not influenced by the incident in court or the discussion of it.  There was no evidence to the contrary."

The Circuit Court, as the trier of fact on this issue, "was empowered to assess the credibility of the jurors."  See Napulou, 85 Hawai'i at 56, 936 P.2d at 1304.  The Circuit Court found:

12.  Although all twelve jurors indicated that neither the incident itself nor the discussion regarding the incident during the deliberations affected their own decision, at least one juror indicated that the incident appeared to have impacted the deliberation process and decision. [4]

.  .  .  .

15.  The Court finds that the jurors' statements that the incident did not affect their decisionmaking process and/or deliberations are not credible as evidenced by the plain language of Communication No. 2 and answers of the voir dire of each individual juror.

"An appellate court will not pass upon the trial judge's decisions with respect to the credibility of witnesses and the weight of the evidence, because this is the province of the trial judge."  State v. Barros, 105 Hawai'i 160, 170, 95 P.3d 14, 24 (App. 2004) (citation and internal quotation marks omitted).  Having presided over the trial and the questioning of the jurors, the Circuit Court was in a better position than this court to assess the credibility of the jurors, understand the

---

4  The record reflects that in response to questioning, Juror 11 specifically stated that the jurors describing the incident sounded concerned, and she believed that this concern for their safety impacted their decision.

dynamics of the trial process in this case, and evaluate the effect that the external incident had on the jurors' deliberations. See Quitog, 85 Hawai'i at 143, 938 P.2d at 574 ("There are especially compelling reasons for allowing a trial judge to exercise broad discretion in deciding whether or not manifest necessity exists.") (citation omitted). In light of the Circuit Court's credibility findings, which we decline to overturn, and under the circumstances presented in this case, we cannot say that the Circuit Court abused its broad discretion in determining that manifest necessity existed for a mistrial. Id.[5]

IV.

Gouveia argues that the Circuit Court erroneously denied his motion to dismiss the indictment, which he sought on double jeopardy grounds. This argument fails in light of our conclusion that the Circuit Court did not abuse its discretion in finding manifest necessity for a mistrial. When a trial court declares a mistrial that is supported by a proper finding of manifest necessity, "retrial is not barred by the defendant's right against double jeopardy[.]" Wilmer, 97 Hawai'i at 242-43, 35 P.3d at 759-60.

CONCLUSION

For the foregoing reasons, we affirm the Circuit Court of the First Circuit's "Order Denying Motion to Dismiss for Violation of Double Jeopardy."

DATED: Honolulu, Hawai'i, April 30, 2015.

Keith S. Shigetomi,
for Defendant-Appellant.

Associate Judge

Donn Fudo,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appeellee.

Associate Judge

---

[5] With respect to whether options less severe than a mistrial were available, the Circuit Court concluded that "neither a continuance nor a further jury instruction would appropriately address the issue of an impartial jury and its subsequent tainted verdict." Although Gouveia asserts that the Circuit Court erred in granting a mistrial, he did not argue in the Circuit Court, and does not argue on appeal, that the Circuit Court erred in failing to consider options less severe than a mistrial. We have no basis for concluding that the Circuit Court erred in failing to use options less severe than a mistrial.